**Ronald E. LEDUNE, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee, Jackson.

May 17, 1979.

G. Robert Radford, Huntingdon, for appellant.

William M. Leech, Jr., Atty. Gen., Richard S. Maxwell, Asst. Atty. Gen., Nashville, George W. Hymers, Dist. Atty. Gen., Howard F. Douglass, Asst. Dist. Atty. Gen., Jackson, for appellee.

## OPINION

DUNCAN, Judge.

The appellant-defendant, Ronald E. Ledune, along with four other individuals,[1] was indicted for first degree murder. He was tried separately in the Henderson County Circuit Court, found guilty of first degree murder and sentenced to serve 28 years in the penitentiary. However, for reasons not stated in the record, the trial court granted the defendant's motion for a new trial[2] and set aside the conviction. At a second trial, the defendant was again found guilty of first degree murder, but this time the jury fixed his punishment at 27 years.

In this appeal, the defendant contests (1) the trial court's action in overruling his motion for a change of venue, (2) the admission of evidence of his silence in the face of an alleged incriminating statement, and (3) the legal sufficiency of the convicting evidence.

We find merit to the defendant's second contention, and we reverse and remand this case for a new trial.

This prosecution arose out of the brutal slaying of Hubert Barker at his trailer home in Lexington. The victim's body was discovered by his son-in-law, Guy Goff, on February 4, 1977. Mr. Barker had been stabbed several times with a sharp instrument and, according to the medical testimony, he died as a result of these multiple stab wounds.

By his first assignment of error, the defendant alleges that the trial court erred in refusing to grant his motion for a change of venue.

The defendant argues in his brief that the death of the victim had received considerable publicity, and that the prospective jurors were aware of Clois Garner's previous trial in which Garner's confession implicating the defendant had been introduced in evidence. Also, he argues that the prospective jurors knew that he had been previously tried and found guilty of murder.

The defendant offered no witnesses or affidavits in support of his motion for a

---

1. The defendant was indicted along with Clois Garner, James Ray Maness, Harrison G. Crowe and Belinda Cagle. Clois Garner was tried separately, convicted of first degree murder and on appeal his conviction was affirmed. *See Clois Garner v. State*, Tenn.Crim.App., unpublished, Jackson, October 12, 1978.

2. According to the defendant's motion for a new trial filed after his first conviction, the case against Maness and Crowe had been dismissed and they had been re-indicted as accessories after the fact. The record contains no information as to the disposition of the case against Belinda Cagle.

change of venue; thus, the record is devoid of any evidence that would support these arguments.

■ Our review of the voir dire proceedings discloses that none of the jurors were questioned about their knowledge, if any, of the previous trials involving the defendant and Clois Garner. We do find that some of the jurors who were ultimately selected had heard about Mr. Barker's death, but each of them stated that they had formed no opinion as to the defendant's guilt or innocence, and that they could render a decision on the evidence presented in court. Several of the prospective jurors were excused for cause because they had fixed opinions about the case. However, in reviewing a claim of prejudicial pre-trial publicity, the question is whether the jurors who actually sat and rendered the verdict were prejudiced by that publicity. *Adams v. State*, 563 S.W.2d 804 (Tenn.Crim.App.1978).

The voir dire of the jurors that tried the defendant revealed no hostility or feeling against him that would have prejudiced his trial. The interrogation of these jurors showed they were impartial, and we find nothing in this record which would indicate that they were anything other than fair and impartial.

■ The question of a change of venue is largely within the discretion of the trial judge, and we may not review his action unless there is a clear abuse of that discretion. *Adams v. State, supra; Broz v. State*, 4 Tenn.Crim.App. 457, 472 S.W.2d 907 (1971). Based on the record before us, we find no abuse of discretion. This assignment is overruled.

Next, the defendant challenges the admission of the testimony of June Dunavant relating to an alleged admission by silence on his part. Ms. Dunavant's testimony concerned a conversation which she overheard between the defendant's co-indictees, Clois Garner and Belinda Garner Cagle.

June Dunavant testified that on the day after the death of Mr. Barker, she and Belinda Cagle were in the house trailer of Belinda's brother, Clois Garner, along with several other people, including the defendant. She stated that Clois Garner took his sister, Belinda, into the bedroom of the trailer, but that the bedroom door remained open. She further stated that she was standing at the entrance to the bedroom, some 6 to 8 feet from Clois Garner and Belinda, could hear and see them talking, and that the defendant was in the living room about the same distance away. At another point in her testimony, she placed the defendant some 16 feet from Clois Garner and Belinda. Ms. Dunavant stated that she did not know whether the defendant could see Clois Garner and Belinda as they conversed. According to her, in addition to the defendant, three other men, Clothel Garner, Tommy Grissom, and Larry Cagle,[3] were seated in the living room. She testified that all of these individuals in the living room were drinking beer, but she did not know whether they were talking. Ms. Dunavant then proceeded to testify about the conversation between Clois Garner and Belinda Cagle, as follows:

Q. Now, what did you—what did you hear that was said in there?

A. I just heard Clois tell Belinda that they robbed Mr. Barker.

Q. Did he use that word "they?" Well, I guess he—

A. He said "we."

Q. He would say "we?"

A. Yes.

Q. All right, he said we did what?

A. He said, "We robbed Mr. Barker." And she said, "You didn't?" And he said, "Yes, we did." And she said, "Well, you didn't hurt him?" And he said, "Well, we had to kill him."

Q. "We had to kill him"?

---

3. According to the testimony of Belinda Cagle, James Maness was also in the trailer at that time.

A. Yes, sir.

Q. And you heard these statements?

A. Yes, sir.

Q. At the time—and the Defendant was there present in that same room where you were when these statements were made?

A. Yes, he was over on the couch.

Q. Did the Defendant say anything at the time these statements were made by Clois Garner?

A. Not that I heard.

Q. Did anybody say anything?

A. Not that I heard, no.

Further, Ms. Dunavant testified that Clois Garner and Belinda came out of the bedroom and that "Clois told us as we was fixing to leave that if we told anybody or if we talked that we would get the same thing Mr. Barker got."

Over the objection of the defendant, the trial court allowed Ms. Dunavant's testimony to go before the jury as an admission by silence on the part of the defendant.

■ Tennessee has long recognized the rule that when a statement is made in the presence and hearing of one accused of an offense and the statement tends to incriminate him, or is of an incriminating character, and such statement is not denied or in any way objected to by him, both the statement and the fact of his failure to deny it or make any response to it, is admissible against him as evidence of his acquiescence in its truth. *Lovvorn v. State*, 192 Tenn. 336, 241 S.W.2d 419 (1951); *Camper v. State*, 187 Tenn. 511, 216 S.W.2d 18 (1948); *Phelan v. State*, 114 Tenn. 483, 88 S.W. 1040 (1904); *Green v. State*, 97 Tenn. 50, 36 S.W. 700 (1896); *Queener v. Morrow*, 41 Tenn. (1 Cold.) 123 (1860); *Kendrick v. State*, 28 Tenn. (9 Hump.) 722 (1849).

■ In recent times in criminal cases this rule of tacit admissions has been modified by constitutional developments, and it will not be applied where the statement and failure to deny occur after police custody or interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Braden v. State*, 534 S.W.2d 657 (Tenn.1976); *Drake v. State*, 576 S.W.2d 593 (Tenn.Crim.App.1978); *Ware v. State*, 565 S.W.2d 906 (Tenn.Crim.App.1978). However, the rule is still viable if the accusation and silence takes place prior to police custody. *See* D. Paine, Tennessee Law of Evidence § 57 (1974).

■ Thus, if the present case involved a true admission by silence, we would find no difficulty in holding that the testimony of the witness would have been properly admitted in evidence. The problem that confronts us, however, is that the facts surrounding the alleged accusation and silence do not warrant a finding that there was such an admission by the defendant. There is a serious question whether the accusation was made in the defendant's presence, and even if so, whether he heard and understood it. But apart from those questions, we find that no accusation was made against this defendant that would have demanded a denial from him. Ms. Dunavant's use of the terms in relating Clois Garner's statement that "We robbed Mr. Barker" and "We had to kill him" has no more reference to the defendant than it would have had at least to four or five other people in the trailer. At no point was the defendant referred to by name or otherwise individually pointed out as being the person against whom the accusation was being made. The pronoun "We" in the context in which Clois Garner used it could have encompassed anyone else in the trailer or for that matter, could have meant another, or others, who were not even on the scene at the trailer. As Mr. Paine points out in his treatise, these "admissions are suspect." It is our opinion that before such admissions can be admitted in evidence, not only must a clear showing be made that the implicating accusation was made in a defendant's presence and clearly understood by him, but also, there must be a direct showing that

the defendant was the target of the accusation.

Therefore, based upon the facts in this record, we hold that the trial court erred in allowing June Dunavant's testimony to be admitted into evidence. We sustain this assignment.

■ We find no merit to the defendant's final complaint about the alleged insufficiency of the evidence. Aside from the testimony of June Dunavant, there was other competent proof implicating the defendant in the killing of Mr. Barker.

The evidence showed that the defendant and his accomplice, Clois Garner, lived together and were in company with each other the day of the murder, as well as the day after. Further, the victim had been robbed of a "stack of bills," and, according to Belinda Cagle, the day after the homicide, she saw the defendant counting money, including "hundred-dollar bills." Also, Elmer Moody testified about an incident where the defendant and Clois Garner wanted to play pool with him, but they did not have any money. Mr. Moody stated that the defendant and Clois Garner left and returned in forty-five minutes to an hour and began playing pool, at which time he noticed that the defendant had a large sum of money consisting of "hundreds and fifties." Moody said to the defendant: "Son, where did you get all that money at? Did you rob a bank, kill somebody, or what?" The defendant replied, "You said it right the last time."

It was the jury's function to place whatever interpretation they desired upon the defendant's answer to Mr. Moody's inquiry, and to draw necessary inferences therefrom, if they so desired.

While the precise date and time that the above events took place involving Mr. Moody are not stated in the record, the jury was entitled to infer, in considering this proof along with the other proof in the record, that those events occurred near the time of Mr. Barker's death, and could have even inferred that Mr. Barker was robbed and killed by the defendant and Clois Garner between the time of their first contact with Mr. Moody about playing pool and the second occasion when the game actually took place.

■ Further, there was evidence that the day after the homicide, the defendant and Clois Garner fled from Tennessee and went to the state of California. The jury was entitled to consider this flight on the part of the defendant as showing an inference of guilt. *Rogers v. State*, 2 Tenn.Crim.App. 491, 455 S.W.2d 182 (1970); 22A C.J.S. *Criminal Law* § 625a, b (1961).

From our review of the competent proof in this record, we conclude that the evidence is ample to support the verdict of the jury. The defendant has failed to carry his burden to show that the evidence preponderates against the verdict and in favor of his innocence. *State v. Thompson*, 549 S.W.2d 943 (Tenn.1977). Therefore, we specifically state that we are not reversing this case because of any insufficiency of the evidence. Rather, our reversal is predicated on the erroneous admission of the testimony of June Dunavant. While we find the evidence to be sufficient to support the verdict, it is obviously not overwhelming, and we cannot say that this improperly admitted evidence did not influence the verdict of the jury to the prejudice of the defendant.

We reverse the defendant's conviction and remand this case for a new trial.

WALKER and DAUGHTREY, JJ., concur.